IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION


GREENSPOINT INVESTORS, LTD.,      §
AND GREENSPOINT WEST, LTD.,       §
                                  §
        Plaintiffs,               §
                                  §
v.                                §     Civil Action No. H-10-4057
                                  §
                                  §
TRAVELERS LLOYDS INSURANCE CO.,   §
                                  §
        Defendant.                §


**MEMORANDUM OPINION**

Pending before the court[1] are the following motions: (1) Travelers Lloyds Insurance Company's ("Travelers") Motion in Limine Regarding Application of the Policy's Inflation Guard Coverage (Doc. 162); (2) Travelers' Motion in Limine to Preclude Evidence Related to Repairs to the Fiber Optics Room (Doc. 163); (3) Travelers' Motion in Limine to Preclude Evidence of Estimated Claims for Extra Expense, Expedited Expenses, Code Upgrades and Debris Removal (Doc. 164); (4) Travelers' Motion in Limine to Preclude Evidence of Alleged Misrepresentations (Doc. 165); and (5) Greenspoint Investors, Ltd., and Greenspoint West Ltd.'s (collectively "Greenspoint" or "Plaintiff") First Motion in Limine (Doc. 166).

For the reasons discussed below, Travelers' Motion in Limine

---

[1] The parties consented to proceed before the undersigned magistrate judge for all proceedings, including trial and final judgment, pursuant to 28 U.S.C. § 636(c) and Federal Rule of Civil Procedure 73.  Docs. 88-89.

Regarding the Policy's Inflation Guard is **GRANTED**; Travelers' Motion in Limine Related to Repairs to the Fiber Optics Room is **GRANTED IN PART AND DENIED IN PART**; Travelers' Motion in Limine to Preclude Evidence of Estimated Claims for Extra Expense, Expedited Expenses, Code Upgrades and Debris Removal is **GRANTED IN PART AND DENIED IN PART**; Travelers' Motion in Limine to Preclude Evidence of Alleged Misrepresentations is **GRANTED**; Plaintiff's First Motion in Limine related to actual cash value is **DENIED**.

## I.  Case Background

On September 13, 2008, a six-story office building located at 11974 North Freeway (the "Building") owned by Greenspoint was damaged by Hurricane Ike.  The building was insured by Travelers.  According to the Joint Pretrial Order, the hurricane damaged the roof, a skylight and some windows and allowed significant amounts of water to enter the building.[2]

Greenspoint's owner, Richard Fallin, formed Ike Reconstruction and Ike Restoration ("Ike Reconstruction"), and Greenspoint hired Ike Reconstruction to undertake the repair work on the Building.[3] There was no written contract between Greenspoint and Ike Reconstruction, but Fallin testified that he "negotiated" the

---

[2]    See Doc. 167, Jt. Pretrial Order p. 2.

[3]    See Doc. 203-4, Ex. D to Pl.'s Reply in Support of its 1st Mot. in Limine, Dep. of Richard Fallin pp. 12-20, 86-88.

2

financial arrangement on behalf of both companies.[4]   Ike Reconstruction invoiced Greenspoint for repair work.[5]   The invoices, but not Ike Reconstruction's actual costs, were provided to Travelers during the adjustment process.[6]

Shortly after the hurricane, Travelers paid Greenspoint a $500,000 advance.[7]   Greenspoint argues that Travelers had all necessary information to pay the claim by late November 2008 but failed to timely pay the claim.   On January 26, 2009, Travelers paid an additional $572,299.47 for property damage.[8]   On April 17, 2009, Travelers paid $203,175 for additional damage to the Building.[9]   In May 2009, a Travelers' contract adjuster estimated that the Building's repairs could total between $2.1 and $3.8 million.[10]   On October 6, 2009, Travelers paid an additional $1,071,166.22, bringing the amount paid by Travelers for Building damage to $2,346,640.60.[11]

---

[4]   Id. p. 87.

[5]   Id. p. 160.

[6]   Id.

[7]   See Doc. 203-6, Ex. E to Pl.'s Reply in Support of its 1st Mot. in Limine, Dep. of Russell D. Joseph p. 131.

[8]   Id. p. 143.

[9]   See Doc. 203-14, Ex. M to Pl.'s Reply in Support of its 1st Mot. in Limine, Travelers' Internal Distribution.   Travelers also paid lost business income, extra expense and personal property claims totaling $226,330.   Id.

[10]   See Doc. 203-12, Ex. K to Pl.'s Reply in Support of its 1st Mot. in Limine, DBI Construction Consultants, Inc.'s Building Repair Estimate.

[11]   See Doc. 203-7, Ex. F to Pl.'s Reply in Support of its 1st Mot. in Limine, Dep. of Murray Corp. Rep. pp. 214-17.

## II.  Legal Standard

The present motions originally were filed as motions in limine.  As the motions sought determinations of contract interpretation in order to obtain preclusion of certain evidence, the court advised the parties that it would consider the motions pursuant to Federal Rule of Civil Procedure 56 and allowed additional briefing.

Summary judgment is warranted when the evidence reveals that no genuine dispute exists regarding any material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Brown v. City of Houston, Tex., 337 F.3d 539, 540-41 (5th Cir. 2003).  A material fact is a fact that is identified by applicable substantive law as critical to the outcome of the suit.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Ameristar Jet Charter, Inc. v. Signal Composites, Inc., 271 F.3d 624, 626 (5th Cir. 2001).  To be genuine, the dispute regarding a material fact must be supported by evidence such that a reasonable jury could resolve the issue in favor of either party.  Anderson, 477 U.S. at 250; TIG Ins. Co. v. Sedgwick James of Wash., 276 F.3d 754, 759 (5th Cir. 2002).

The movant must inform the court of the basis for the summary judgment motion and must point to relevant excerpts from pleadings, depositions, answers to interrogatories, admissions, or affidavits

4

that demonstrate the absence of genuine factual issues.  Celotex Corp., 477 U.S. at 323; Topalian v. Ehrman, 954 F.2d 1125, 1131 (5th Cir. 1992).  If the moving party can show an absence of record evidence in support of one or more elements of the case for which the nonmoving party bears the burden, the movant will be entitled to summary judgment.  Celotex Corp., 477 U.S. at 322.  In response to a showing of lack of evidence, the party opposing summary judgment must go beyond the pleadings and proffer evidence that establishes each of the challenged elements of the case, demonstrating that genuine issues of material fact do exist that must be resolved at trial.  Id. at 324.

When considering the evidence, "[d]oubts are to be resolved in favor of the nonmoving party, and any reasonable inferences are to be drawn in favor of that party."  Evans v. City of Houston, 246 F.3d 344, 348 (5th Cir. 2001); see also Boston Old Colony Ins. Co. v. Tiner Assocs. Inc., 288 F.3d 222, 227 (5th Cir. 2002).  The court should not "weigh evidence, assess credibility, or determine the most reasonable inference to be drawn from the evidence."  Honore v. Douglas, 833 F.2d 565, 567 (5th Cir. 1987).

However, the nonmoving party must show more than "some metaphysical doubt as to the material facts."  Meinecke v. H & R Block of Houston, 66 F.3d 77, 81 (5th Cir. 1995).  Conclusory allegations, unsubstantiated assertions, improbable inferences, unsupported speculation, or only a scintilla of evidence will not

carry this burden.  Brown, 337 F.3d at 541; Ramsey v. Henderson, 286 F.3d 264, 269 (5th Cir. 2002).  The court must grant summary judgment if, after an adequate period of discovery, the nonmovant fails "to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp., 477 U.S. at 322.

## III.  Analysis

### A.  Actual Cash Value

Insurance policies are subject to the rules of contract interpretation.  Tanner v. Nationwide Mut. Fire Ins. Co., 289 S.W.3d 828, 831 (Tex. 2009).  In construing the terms of a written contract, the court's primary purpose is always to "ascertain the true intent of the parties as expressed in the instrument." Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. CBI Indus., 907 S.W.2d 517, 520 (Tex. 1995); see also Tanner, 289 S.W.3d at 831.  To this end, the court reads all provisions within the contract as a whole and gives effect to each term so that no part of the agreement is left without meaning.  MCI Telecomms. Corp v. Tex. Utils. Elec. Co., 995 S.W.2d 647, 652 (Tex. 1999).  Courts construe terms in contracts to have their plain, ordinary meaning unless something in the contract itself indicates that the parties intended for them to have particular definitions.  Tanner, 289 S.W.3d at 831.

When a contract as worded can be given "a definite or certain

legal meaning," then it is unambiguous as a matter of law, and the court enforces it as written.  CBI Indus., 907 S.W.2d at 520; see also Fiess v. State Farm Lloyds, 202 S.W.3d 744, 746 (Tex. 2006). The court will not find a contract ambiguous merely because the parties advance conflicting interpretations.  Kelley-Coppedge, Inc. v. Highlands Ins. Co., 980 S.W.2d 462, 465 (Tex. 1998).

The Travelers' policy applicable to this loss states that, in the event of a covered loss, Travelers "will either:  (1) Pay the value of the lost or damaged property; (2) Pay the cost of repairing or replacing the lost or damaged property subject to b. below; (3) Take all or any part of the property at an agreed or appraised value; or (4) Repair, rebuild or replace the property with other property of like kind and quality, subject to b. below."[12]

The Policy provided its insured the option to elect either replacement cost or actual cash value ("ACV") for damage to the insured property if it chose not to replace or repair the damaged property.[13]  Greenspoint has elected to receive ACV and does not

---

[12]   See Doc. 164-3, Ex. A to Travelers' Mot. in Limine, Policy p. 6. Paragraph b. incorporated by reference states, "The cost to repair, rebuild or replace does not include increased cost attributable to enforcement of any ordinance or law regulating the construction, use or repair of any property, except as provided in the Ordinance or Law Additional Coverage." Id. p. 6.

[13]   Id. p. 7. That Section states, "You may make a claim for loss or damage covered by this insurance on an actual cash value basis instead of on a replacement cost basis.  In the event you elect to have loss or damage settled on an actual cash value basis, you may still make a claim on a replacement cost basis if you notify us of your intent to do so within 180 days after the loss or damage." Id.

intend to repair or replace many damaged items.  Greenspoint seeks rulings that: (1) ACV may be determined without consideration of the actual cost of a repair; (2) Greenspoint had no obligation to disclose to Travelers its actual costs in making a repair; and (3) the jury may not be informed of the actual cost of a repair in determining ACV because the actual cost of a repair is irrelevant and would be confusing to the jury.  The court first considers ACV.

The policy does not define ACV but several courts have explained the concept, as compared to replacement cost.  In <u>Stevens v. Allstate Ins. Co.</u>, Civ. Action 13-5102, 2014 WL 2882957, at *3 fn.1 (E.D. La. June 25, 2014), the court explained that an ACV provision allowed immediate payment to an insured regardless of whether repairs had been made or would be made, but a replacement cost provision allowed payment only after repairs had been made.  In other words, under an ACV provision, the insured had the responsibility to pay the cash difference necessary when replacing old property with new property.  <u>Id.</u>  Because ACV is typically determined soon after the damage occurs but before repairs are commenced, "it ordinarily is established via an estimate."  <u>Id.</u> at *4.

In <u>Ghoman v. N.H. Ins. Co.</u>, 159 F.Supp.2d 928, 934 (N.D. Tex. 2001), the court acknowledged that, under Texas law, ACV is synonymous with "fair market value."  <u>Id.</u> (citing <u>Great Tex. Cnty. Mut. Ins. Co. v. Lewis</u>, 979 S.W.2d 72, 74 (Tex. App.–Austin 1998,

no pet.)); Guaranty Cnty. Mut. Ins. Co. v. Williams, 732 S.W.2d 57,
60 (Tex. App.–Amarillo 1987, no writ); U.S. Fire Ins. Co. v.
Stricklin, 556 S.W.2d 575, 582 (Tex. Civ. App.–Dallas 1977, writ
ref'd n.r.e.).

The Ghoman court defined fair market value as "the price a
willing purchaser who is under no obligation to buy would pay to a
willing owner who is under no obligation to sell."  159 F.Supp.2d
at 934 (citations omitted).  Fair market value may be determined by
looking at comparable sales, income capitalization, or the cost of
repair or replacement less depreciation.  Id. (citing Religious of
the Sacred Heart of Tex. v. City of Houston, 836 S.W.2d 606, 615-16
(Tex. 1992)).  The Ghoman court applied the third option, "repair
or replacement costs less depreciation" in determining the amount
of the insured's loss.  Id.

The court found that repair or replacement costs included "any
cost that an insured is reasonably likely to incur in repairing or
replacing a covered loss."  Id. (citations omitted).  In so
holding, the court found that replacement costs included the
contractor's overhead, profit and sales tax because those costs
were reasonably likely to be incurred, even if the insured did not
actually incur some of those costs because he completed the repairs
himself.  Id.

In contrast to Ghoman, in Dwyer v. Fid. Nat'l Prop. & Cas.
Ins. Co., 428 F. App'x 270, 271 (5th Cir. 2011)(unpublished), a

9

flood insurance case, the Fifth Circuit held that an ACV award which included an estimate for overhead and profit attributed to a hypothetical independent contractor was improper because the insureds sold the property in its unrepaired state and, therefore, would not incur those costs.

In a flood insurance case following <u>Dwyer</u>, the district court allowed overhead and profit in the determination of ACV because the homeowners incurred, or would incur, the expense of a general contractor. <u>Tuircuit v. Wright Nat'l Flood Ins. Co.</u>, Civ. Action No. 13-6268, 2014 WL 5685222, at *5 (E.D. La. Nov. 4, 2014). In <u>Tuircuit</u>, the court was tasked with determining whether the insurer breached the insurance contract when it paid a lower ACV amount based on its adjuster's estimate rather than the homeowner's expert's estimate. <u>See Tuircuit</u>, 2014 WL 5685222, at **1, 5. The court stated that, as the case involved a flood insurance policy, it was required to interpret the policy in accordance with federal law, the Federal Emergency Management Agency regulations and federal common law. <u>Tuircuit</u>, 2014 WL 5685222, at *4.

Citing to federal regulations, the court found that ACV meant "the cost to replace an insured item of property at the time of loss, less the value of its physical depreciation." <u>Id.</u> at *5 (citing 44 C.F.R. pt. 61, app. A(a), art. II (B)(2)). The court stated, "The Court may use an estimate to determine ACV, taking into consideration actual expenses incurred to ensure the validity

10

of that estimate." Id. (citing Stevens v. Allstate Ins. Co., 13-5102, 2014 WL 2882957, at *4 (E.D. La. 2014)).  The court turned to consider whether overhead and profit were appropriately included in a calculation of replacement cost when determining ACV.  See id. at *5.

The Tuircuit court acknowledged that in Dwyer, the Fifth Circuit held that an award which included overhead and profit was inappropriate where the insureds sold the home in its unrepaired state.  Id. at *5.  However, the court concluded that the facts presented showed that the insureds hired a general contractor to initiate repairs, and, because the facts indicated that they had incurred or would incur the expense of a general contractor, an award of overhead and profit was appropriate in calculating ACV. Id.  Other cases have come to similar conclusions.  See Parkway Assocs., LLC v. Harleysville Mut. Ins. Co., 129 F. App'x 955, 962-63 (6th Cir. 2005)(unpublished)(finding that overhead and profit includable in ACV "where a contractor would reasonably be utilized to make repairs."); Tolar v. Allstate Tex. Lloyd's Co., 772 F.Supp.2d 825, 831-32 (N.D. Tex. 2011)(holding that contractor overhead is includable in replacement cost component of ACV and may be reduced by depreciation component of ACV).

Thus, the linchpin in calculation of replacement costs appears to be whether the challenged cost is reasonably likely to be incurred or not.  The court concludes that to determine ACV, the

jury may consider the replacement cost of the insured property at the time of the loss, meaning, the cost reasonably likely to be incurred in repairing or replacing the damaged property, less depreciation.  If the cost is not reasonably likely to be incurred, the jury may omit it in calculating replacement cost.

And, because ACV is synonymous with "fair market value," meaning, the actual cash loss to the insured, the property's market value may be relevant to that determination.  See City of Tyler v. Likes, 962 S.W.2d 489, 497 (Tex. 1997)("As a rule, [property damage] is measured by the property's market value or the cost of repairing it."); Crisp v. Sec. Nat'l Ins. Co., 369 S.W.2d 326, 329 (Tex. 1963)(stating that the trier of fact may consider original cost, replacement cost and opinions as to market value in determining actual value of household goods and personal effects); Aetna Cas. & Sur. Co. v. Florentine Marble & Tile Corp., 549 S.W.2d 24, 28 (Tex. Civ. App.—El Paso 1977, no writ)(stating that in determining the ACV of the insured's stolen property, the jury could consider, among other things, the reported value of those items on the insured's tax return).  Therefore, Greenspoint's own valuation of its property, whether found in tax returns or other documents, may be relevant in determining fair market value as that is relevant to the determination of ACV.

Greenspoint next argues that, in determining ACV, the actual cost of a repair is irrelevant and, in related arguments, that the

Policy did not require Greenspoint to disclose to Travelers the costs actually incurred in repairing the Building and that it was bad faith for Travelers to fail to pay ACV benefits as estimated based on Greenspoint and Ike Reconstruction's refusals to disclose Ike Reconstruction's actual expenses and costs to make certain repairs.

"Under Texas law, there is a duty on the part of the insurer to deal fairly and in good faith with an insured in the processing of claims." Higginbotham v. State Farm Mut. Auto. Ins. Co., 103 F.3d 456, 459 (5th Cir. 1997). The Texas Insurance Code allows an insured to recover actual damages, court costs, attorney's fees, and, upon a showing that the insurer acted knowingly, up to three times actual damages for unfair settlement practices. Tex. Ins. Code §§ 541.060; 541.152. Particularly in relation to this lawsuit, the statute allows recovery for "failing to attempt in good faith to effectuate a prompt, fair, and equitable settlement of . . . a claim with respect to which the insurer's liability has become reasonably clear."[14] Tex. Ins. Code § 541.060.

Whether the "insurer breaches its duty of good faith and fair dealing by denying or delaying payment of a claim" is determined by whether "the insurer knew or should have known it was reasonably

---

[14] A bad faith cause of action lies under Texas common law as well. As with a statutory claim, common law places a duty on an insurer to deal fairly and in good faith in processing claims. Higginbotham, 103 F.3d at 459. The same analysis is used for statutory and common law bad faith claims. See United Svs. Auto. Ass'n v. Croft, 175 S.W.3d 457, 471-72 (Tex. App.–Dallas 2005, no pet.).

13

clear the claim was covered." _Universe Life Ins. Co. v. Giles_, 950 S.W.2d 48, 49 (Tex. 1997); _see also_ _United States Fire Ins. Co. v. Williams_, 955 S.W.2d 267, 268 (Tex. 1997).  Even if the insurer is wrong in denying a claim, it is not liable for bad faith if it can establish the existence of a bona fide dispute.  _Williams_, 955 S.W.2d at 268.  The insured must offer evidence that the insurer had no facts to support a denial .  _Higginbotham_, 103 F.3d at 459; _see also_ _Lyons v. Millers Cas. Ins. Co. of Tex._, 866 S.W.2d 597, 600 (Tex. 1993).  An insurer maintains "the right to deny questionable claims without being subject to liability for the erroneous denial of the claim." _United Servs. Auto. Ass'n v. Croft_, 175 S.W.3d 457, 471 (Tex. App.-Dallas 2005, no pet.).

The existence of a reasonable basis for a denial is to be judged according to the facts before the insurer at the time. _Harbor Ins. Co. v. Urban Constr. Co._, 990 F.2d 195, 202 (5th Cir. 1993); _Viles v. Sec. Nat'l Ins. Co._, 788 S.W.2d 566, 567 (Tex. 1990).  Even though the facts before the insurer at the time are key, post-denial evidence may be relevant because there can be no claim for bad faith when an insurer has denied a claim that is, in fact, not covered and the insurer has not otherwise breached the contract.  _Republic Ins. Co. v. Stoker_, 903 S.W.2d 338, 340-41 (Tex. 1995).

In the present case, Greenspoint, citing the deposition testimonies of several Travelers' adjusters, argues that what an

14

insured spent on actual repairs is irrelevant when determining ACV.[15]  For example, Russell Joseph ("Joseph"), one of Travelers' adjusters, testified that ACV is what it would reasonably cost, hypothetically, to repair the insured property, and that a policyholder did not have to use an ACV payment to make repairs.[16] Joseph also testified that Travelers' practice is to pay ACV claims based on estimates, not actual repair costs.[17]

Greenspoint argues that, because Travelers usually pays ACV based on estimates, it was not entitled to ask for Ike Reconstruction's actual costs and expenses before paying the ACV claim.  The court disagrees.

The Policy in issue places a duty on the insured to give "complete inventories of the damaged and undamaged property. Include quantities, costs, values and amount of loss claimed."[18] The Policy also requires that the insured "[c]ooperate with us in the investigation and settlement of the claim."[19]  In determining ACV, actual expenses incurred in making a repair may also be considered in determining the validity of that estimate.  <u>Parr v.</u>

---

[15]     <u>See</u> Doc. 203, Pl.'s Reply in Support of its 1st Mot. in Limine pp. 15-19.

[16]     <u>See</u> Doc. 203-6, Ex. E to Pl.'s Reply in Support of its 1st Mot. in Limine, Dep. of Russell D. Joseph pp. 58-60, 62-65, 72, 241.

[17]     <u>Id.</u> pp. 84-85, 103, 188.

[18]     <u>See</u> Doc. 203-1, Ex. A-1, Pl.'s Reply in Support of its 1st Mot. in Limine, Policy, p. 44.

[19]     <u>Id.</u>

Allstate Ins. Co., Civ. Action No. 13-6242, 2014 WL 5210902, at *4
(E.D. La. Oct. 14, 2014).

Greenspoint has made a number of bad faith and Insurance Code
claims arising from Travelers' claims handling process.  Among
those allegations are that Travelers delayed paying Greenspoint's
claim, failed to conduct an unbiased investigation of the loss and
offered "grossly inadequate and unconscionable sums" to settle the
claims.[20]  The crux of this dispute turns on whether and/or when
Travelers' liability became reasonably clear.  Evidence that
supports a bona fide coverage dispute does not establish bad faith.
See State Farm Lloyds v. Nicolau, 951 S.W.2d 444, 448 (Tex. 1997).
The jury will have to consider whether the information requested by
Travelers concerning actual costs of repairs was justified by a
bona fide dispute when determining Greenspoint's bad faith claims.
The court will not exclude evidence of the actual costs of repairs
incurred by Ike Reconstruction.  In so finding, the court rejects
Greenspoint's argument that this evidence will be prejudicial and
confusing to the jury.  Juries have resolved matters far more
complicated than an insurance bad faith claim.

## B.  Claimed Damage to the Fiber Optics Room

A long-term Building tenant leases space to house fiber optics
communication equipment.  Under the terms of the lease, the tenant

---

[20]    See Doc. 167, Ex. A to Joint Pretrial Order, Greenspoint's
Contentions p. 8.

16

retains complete control over the leased space.[21]  The Lease also allocates responsibility for any nonstructural repairs and maintenance in the fiber optics room to the tenant.[22]  When the tenant took possession of the leased space, it was essentially a "shell," and the tenant built out the space to its specifications.[23] In the case of damage to the leased space, the Lease provided, "The Lessor shall be deemed to have satisfied its obligation hereunder to return Premises to tenantable condition (for purposes of recommencing Lessee's rental obligations) by restoring the Building "shell" or "slab" construction in the Premises . . . ."[24]

The Lease also required Plaintiff and the tenant to carry property casualty insurance and commercial general liability insurance.[25]  The Lease stated, "Any insurance carried by Lessor or Lessee against loss or damage to the Building or to the Premises shall be for the sole benefit of the party carrying such insurance and under its sole control, subject to the foregoing provisions of this Section."[26]

Despite the above Lease sections allocating responsibilities

---

[21]    See Doc. 163-5, Ex. 3 to Travelers' Mot. in Limine, Lease Dated Nov. 20, 2000 ("Lease").

[22]    Id., § 12 ("Lessee shall make all nonstructural repairs.").

[23]    See Doc. 163-4, Ex. 2 to Travelers' Mot. in Limine, Dep. of James E. Williamson p. 42.

[24]    See Doc. 163-5, Ex. 3 to Travelers' Mot. in Limine, Lease § 35.

[25]    Id. §§ 30, 31.

[26]    Id. § 35(d).

for repairs, after the hurricane, the tenant allowed Plaintiff to make repairs to the drywall, tile flooring and insulation that were water-damaged.[27]  The tenant's representative testified that after the hurricane, Greenspoint "gutted all the sheetrock in the equipment room, storage room and office space, along with the insulation."[28] Greenspoint also installed new carpeting in the office space.[29]  The tenant testified, "[Greenspoint] just restored it to where it was normal."[30]  These repairs did not require relocation of any fiber optics equipment, and the repairs were conducted after the tenant's equipment was covered with a layer of Visqueen.[31]  After those repairs were made in 2008, the tenant has not experienced any significant issues regarding the condition of the leased space and has not made a demand for repair of damage to its leased space arising from Hurricane Ike.[32]

Despite the above testimony, in January 2014, Greenspoint proferred a supplemental expert report seeking up to $6.2 million representing the ACV of damage to the fiber optics room. Greenspoint's experts posit several scenarios to repair,

---

[27]   See Doc. 163-4, Ex. 2 to Def. Travelers' Mot. in Limine, Dep. of James E. Williamson p. 45.

[28]   Id. p. 30.

[29]   Id.

[30]   Id.

[31]   Id. pp. 114, 116.

[32]   The tenant's rent was abated for a period of time, and Travelers has paid that claim to Greenspoint.  It is not a disputed item in this action.

hypothetically, the fiber optic room's drywall and flooring.  Those options include creating a new permanent fiber optics room (Ex. H) or a temporary functioning fiber optics room (Ex. I), or storing the equipment offsite and reinstalling the equipment when the repairs were concluded (Ex. J).[33]  Greenspoint claims it is entitled to the ACV of this hypothetical repair, analogizing the cost of moving the tenant's fiber optics operations to moving a stove when replacing damaged drywall in back of the stove.[34]

Travelers argues that the cost of moving the fiber optics equipment to a new location and setting up a working fiber optics room relates to the cost of keeping a tenant operational during a repair and is not available under the Policy.  Travelers also argues that these repairs are to items which are the tenant's responsibility under the Lease and, for that reason, are not covered under the Policy.  Greenspoint argues that Travelers is not a third-party beneficiary under the Lease and cannot claim the benefit of certain Lease provisions.

Here, to state the obvious, the Policy insures damage to Plaintiff's own property, not property belonging to a tenant.

---

[33]    See Doc. 217, Traveler's Sur-Reply pp. 2-3 (quoting the deposition of E. Peterson at pp. 99-101, 127-28 and citing to deposition exhibits H, I and J).

[34]    The court does not consider a Travelers employee's concession that in the stove scenario, the movement of the stove would be part of the covered repair to be an admission applicable to the present situation.  At a later point in his deposition, the employee directly disputed that movement of the fiber optics room would be a legitimate repair expense.  See Doc. 202, Traveler's Reply p. 8.

While ACV is generally determined by calculating replacement cost less depreciation, in this case, adding into the calculation of replacement cost the extraordinary cost of keeping the tenant in operation by relocating its operation during a repair, does not reflect the value of damage to the Building.  In short, the court does not consider the movement of a stove to obtain access to damaged drywall analogous to the relocation, reconnection and continued operability of telecommunications equipment which is for the sole benefit of the tenant.  These costs may not be included in a claim for ACV related to the fiber optics room.

The court next considers whether the fiber optics room contains property of Greenspoint for which it may recover ACV. Under the Lease, Greenspoint is only responsible for the "shell" or "slab" of the fiber optics room.  Section 35(c) of the Lease states in part, "[Greenspoint] shall not be required to rebuild, repair, or replace any of Lessee's fixtures, . . . nor any cost to reconstruct any portions of the interior improvements of the Premises (i.e., improvements in excess of so-called 'shell' or 'slab' construction)."[35]

Consistent with the Lease obligations, the tenant's representative testified the tenant installed the original interior

---

[35]     See Doc. 202-10, Ex. J to Traveler's Reply to Pl.'s Opposition to Traveler's Mot. in Limine Related to Repairs to the Fiber Optics Room, Lease Agreement § 35.

partition walls and the carpeting in the office area.[36]   The tenant's representative testified that it plans to replace the non-conductive flooring in the fiber optics room in the near future because that type of flooring deteriorates over time and needs to be redone every seven or eight years.[37]   He considered it "part of your normal ebb and flow."[38]   Thus, unrebutted evidence is that the anticipated repair to the flooring was not related to damage inflicted by the hurricane.

Dennis Di Millo ("Di Millo"), a Travelers' expert, testified that the leased space involves two outside perimeter walls and several interior walls.[39]   Unique to this leased space is the heating and cooling system that was installed by the tenant or its predecessor telecommunications company and is contained within the build-out of the tenant's perimeter walls.[40]   The build-out of the perimeter walls blocks the Building's windows to provide additional climate control in the tenant space.[41]

Greenspoint had no legal obligation to repair or replace the

---

[36]    See Doc. 202-12, Ex. L to Traveler's Reply to Pl.'s Opposition to Traveler's Mot. in Limine Related to Repairs to the Fiber Optics Room, Dep. of James Williamson p. 45.

[37]    Id. pp. 31-32.

[38]    Id. p. 32.

[39]    See Doc. 202-11, Ex. K to Traveler's Reply to Pl.'s Opposition to Traveler's Mot. in Limine Related to Repairs to the Fiber Optics Room, Aff. of Dennis Di Millo p. 3.

[40]    Id.

[41]    Id.

tenant's drywall or flooring in the fiber optics room, including the exterior walls, which pursuant to the Lease, have been deemed property of the tenant.  Thus, even though Greenspoint repaired all the sheetrock in the fiber optics room after the hurricane, under the lease, those walls are property of the tenant.  Importantly, the tenant's representative testified that it has not requested any repairs be made to its leased space.

As discussed above, replacement costs may only include those costs that reflect damage to property of the insured and that are reasonably likely to be incurred.  The record before the court shows that is it not reasonably likely that any repair will be made to the fiber optics room's drywall or flooring.  Greenspoint's argument that Travelers may not claim the benefit of the Lease's provisions misses the point:  Travelers may not be a third-party beneficiary of the Lease, but, as the Lease allocates ownership or responsibility for the parties' property, it is relevant when determining what is covered under the Policy and also what is reasonably likely to be included in replacement costs.

Thus, damage to the fiber optics room may not be calculated with reference to the hypothetical costs associated with the hypothetical relocation and/or storage of the tenant's equipment or the hypothetical repair of drywall or flooring that are the

tenant's responsibility.[42]

The court will preclude evidence related to the costs of relocation of the fiber optics equipment and repairs to drywall and flooring.  The only evidence that may be considered by the jury with respect to the fiber optics room is the damage to the "shell" or "slab" of the Building that does not reflect any tenant modifications or improvements beyond the "shell" or "slab" of the Building.

**C.   Motion in Limine Regarding Application of the Policy's Inflation Guard Coverage**

Plaintiff seeks a declaration that the Policy's Inflation Guard provision increases the Policy's limit until the claim is completely resolved.  Travelers argues that Policy's limit is determined at the date of loss, not the date when the claim is paid.  In considering this motion, the court applies the contract interpretation case law discussed in section A above.

The Policy's Inflation Guard provision provided:

C.   Limits of Insurance

1.  The most we will pay for loss or damage in any one occurrence is the applicable Limit of Insurance shown in the Declarations, Schedules, Coverage Forms, or endorsements.

2.   Inflation Guard

---

[42]     The court is fully cognizant that ACV may be determined by reference to "replacement or repair value" and that, if repairs were actually required to be made, it is possible that the fiber optics equipment would have to be relocated or stored.  However, the lease allocates this expense to the tenant, not Greenspoint.

a.  When a percentage for Inflation Guard is shown in the Declarations, the Limit of Insurance for property to which this coverage applies will automatically increase by that annual percentage.

b.  The amount of the increase will be:

1.  The Limit of Insurance that applied on the most recent policy inception date, the policy anniversary date, or any other policy change amending the Limit of Insurance, multiplied by

2.  The percentage of annual increase shown in the Declarations, expressed as a decimal (example: 8% is .08), multiplied by

3.  The number of days since the beginning of the current policy year or the effective date of the most recent policy change amending the Limit of Insurance, divided by 365.

Example:

If:

The applicable Building limit is $100,000

The annual percentage increase is 8%

The number of days since the beginning of the policy year (or last policy change) is 146

The amount of increase is $100,000 x .08 x 146/365 = $3,200[43]

---

[43]   Doc. 162-3, Ex. 1 to Travelers' Mot. in Limine, pp. 31-32.

The Policy commenced on May 15, 2008.[44]  The Declarations page for the Policy shows that the Building was insured for $6,231,500, "replacement cost," with an Inflation Guard multiplier of 3.0 percent.[45]  Under the terms of the Policy, the Limit of Insurance increased daily from the Policy's inception date, May 15, 2008, or the policy's anniversary date, or any other policy change that amended the Limit of Insurance, through the stated term of the Policy.

Plaintiff argues that the Policy's Limit increased on an annual basis past the term of the Policy because the Policy's language does not expressly state that it is to be calculated on the date of loss, and any other interpretation would effectively rewrite the Policy.  The court disagrees.

Plaintiff correctly posits that the intention of the inflation guard provision is to increase the applicable limit of insurance to protect the insured from inflation.  However, the court would add that the inflation protection is limited to the term of the policy.  Here, the Policy had a specific term, one year.  The Policy states that the inflation percentage is to be calculated based on the most recent renewal date or any other Policy change amending the limit of insurance.  Therefore, the unambiguous language of the Policy provided that the Limit of Insurance on the Policy's inception

---

[44]  Id. p. 2.

[45]  Id. p. 3.

25

date, April 25, 2008, was $6,231,500, and increased three percent
to $6,418,445 at the Policy's expiration date, April 24, 2009.  If
the Policy was renewed, the inflation guard provision would
recommence at $6,418,445 on April 25, 2009, and increase three
percent over the course of the next year.  And the renewal premium
would reflect that known, increased range of coverage.  Under
Plaintiff's interpretation of the Policy, an unresolved claim could
increase the Policy's limit of insurance beyond the contracted
range of the inflation guard for any particular term of the Policy.
The court deems this to be an unreasonable interpretation of the
Policy.  See Kourosh Hemyari v. Stephens, 355 S.W.3d 623, 626 (Tex.
2011)(commenting that, under general rules of contract
construction, courts avoid strictly construing a contract if it
would lead to absurd results).

Here, the only date that could have triggered the Inflation
Guard provision was the policy's inception date, as the loss
occurred within the first year of the policy's term.  On the date
of the loss, September 13, 2008, 121 days later, the Policy's Limit
of Insurance had increased to $6,293,473.54.[46]  The court interprets
the Limit of Insurance applicable to the present dispute to be
determined as of the date of the loss and is $6,293,473.54.

**D.   Motion in Limine Regarding Claims for Extra Expense, Expedited
      Expenses, Code Upgrades and Debris Removal**

---

[46]   $6,231.500 x .03 x 121/365 = $61,973.54.  $6,231,500 + $61,973.54 =
$6,293,473.54.

Separate from the Loss Payment provision discussed above, the Policy provides several additional coverages that are applicable to the present dispute.   Travelers argues that these provisions are limited to reimbursement for expenses actually incurred and may not be paid under the ACV option.

### 1.  Extra Expense Coverage

The Policy's Extra Expense provision states:

> Extra Expense means reasonable and necessary expenses you incur during the "period of restoration" that you would not have incurred if there had been no direct physical loss of or damage to property caused by or resulting from a Covered Cause of Loss.[47]

The Extra Expense provision goes on to explain that it covers those expenses to "avoid or minimize the 'suspension' of business and to continue 'operations' at the described premises or at replacement premises . . . including relocation expenses and costs to equip and operate replacement premises."[48]   Thus, the intent of the coverage is to reimburse the insured for those additional expenses incurred in order to minimize the suspension of business during the period of restoration.

Consistent with this intent in <u>Travelers Indem. Co. v. Pollard Friendly Ford Co.</u>, 512 S.W.2d 375, 381 (Tex. Civ. App.—Amarillo 1974, no writ), the court determined that extra expense insurance was directed toward coverage of "necessary emergency expenses" and

---

[47]   <u>See</u> Ex. 164-3, Ex. A to Travelers' Mot. in Limine, Policy p. 4.

[48]   <u>Id.</u>

did not cover fixed expenses normally incurred by the business. The court allowed as extra expenses costs incurred for security of the property, clean up of debris, extra compensation for employees, extra meals and property obtained for temporary use. Id.; see also Nassau Gallery, Inc. v. Nationwide Mut. Fire Ins. Co., No. Civ. A. 00C-05-034, 2003 WL 21223843, at *2, (Del. Super. Ct. Apr. 17, 2003)(stating that "Extra Expenses" are for the costs associated with continuing "as nearly as practicable" the normal conduct of the insured's business and do not include reconstruction-related expenditures); Rimkus Consulting Grp., Inc. v. Hartford Cas. Ins. Co., 552 F.Supp.2d 637, 647 (S.D. Tex. 2007)(stating that "Extra Expenses" must relate to temporary expenses of continued operation, not expenses related to a new, permanent location). In each of the above cases, the extra expenses were actually incurred by the insured.

Also, as these emergency expenses do not reflect a damage to the insured property for purposes of ACV, they may not be added into the replacement cost component when calculating ACV. The court agrees with Travelers that the Extra Expense provision is only payable under the Policy if the expense was actually incurred by Plaintiff. No witness shall be allowed to include in a damage calculation an expense that falls within this coverage unless it was actually incurred by Greenspoint.

## 2. Expediting Expenses

28

The Policy states:

> In the event of direct physical loss of or damage to Covered Property caused by or resulting from a Covered Cause of Loss, we will pay for the reasonable and necessary additional expenses you incur to make temporary repairs, expedite permanent repairs, or expedite permanent replacement, at the premises sustaining loss or damage.[49]

Again, the Policy covers those Expediting Expenses actually incurred.  An expediting expense does not inform a damage to property that is properly includable in a calculation of ACV.  No witness shall be allowed to include in a damage calculation an expense that falls within this coverage unless it was actually incurred.

### 3.  Code Upgrades

The Policy provides limited coverage for certain actual expenses incurred when complying with the enforcement of an ordinance or law.  First, the Policy states that, "the cost to repair, rebuild, or replace does not include the increased cost attributable to enforcement of any ordinance or law regulating construction, use or repair of any property, except as provided in the Ordinance or Law Additional Coverage."[50]

The Ordinance or Law Additional Coverage section has three subsections.  Coverage A limits coverage when the building is not

---

[49] Id. p. 5.

[50] Id. p. 6.

being repaired to the ACV of the building at the time of the loss.[51] Coverage B is applicable to demolition costs and is limited to the amounts actually spent on demolition.[52] Coverage C covers increased costs of construction and provides that Travelers will only pay after the property is "actually repaired or replaced" and within two years after the loss.[53]

In Jardine v. Maryland Cas. Co., Nos. 10-3335 SC, 10-3336 SC, 10-3318 SC, 10-3319SC, 2011 WL 6778798, at *1 (N.D. Cal. Dec. 27, 2011), the insured sought coverage for certain business property after a fire.  The insured's policy allowed the cost of code upgrades for "increased costs incurred to comply with enforcement of an ordinance or law in the course of repair, rebuilding, or replacement of damaged parts of that property." Id. at *5.  The insured did not made any code upgrades but nonetheless sought coverage for that damage because, had he applied for a building permit, the code upgrades would have been required.  Id.  The court found that the insured was not entitled to code upgrades that were never performed, stating, "To hold otherwise would award [the insured] the kind of windfall payment that is expressly foreclosed by the policy." Id.

Under the Policy, Plaintiff may not recover for code upgrades

---

[51]    Id. p. 12.

[52]    Id.

[53]    Id.

unless the property was actually repaired in conformity with the code requirement.  No witness shall be allowed to include in a calculation of the replacement cost component of ACV a hypothetical code upgrade.

### 4. Debris Removal

The Policy states under Texas Changes, item A.1.:

a.  We will pay your expense to remove debris of Covered Property caused by or resulting from a Covered Cause of Loss that occurs during the policy period.

b.  But if the sum of direct physical damage and debris removal expense exceeds the Limit of Insurance, we will pay up to an additional $25,000 in any one occurrence under the Debris Removal Additional Coverage.[54]

The Policy does not define debris removal, therefore the court must give the term its ordinary meaning.  <u>Tanner</u>, 289 S.W.3d at 831.  Greenspoint's expert, Howard Wolf ("Wolf"), explained that debris removal was the process of gathering and moving of debris or demolition material from the building into a dumpster and then disposing of the contents of the dumpster off-premises.[55]  Debris removal costs generally consist of dumpster costs, general labor and a small percentage of supervisory labor, according to Wolf.[56]  Wolf distinguished debris removal from the demolition process,

---

[54]     <u>Id.</u> p. 10.

[55]     Doc. 200-3, Ex. 3 to Traveler's Reply Mem. in Resp. to Pl.'s Opp. to Traveler's Mot. in Limine to Preclude Evidence of Estimated Claims for Extra Expense, Expedited Expenses, Code Upgrades and Debris Removal Coverage, Dep. of Howard Wolf pp. 43-44.

[56]     <u>Id.</u> pp. 50-52.

which is generally calculated solely in terms of the labor required to demolish the item.[57]   Travelers' expert testified similarly, distinguishing between the demolition of damaged drywall and its disposal/removal from the structure.[58]

Greenspoint contends that debris removal is a covered item under the building coverage and the Debris Removal provision is triggered when the limit of insurance has been exhausted. Travelers contends that the Debris Removal provision is an absolute limit of $25,000 on the cost allowed for debris removal under the Policy, citing the long-standing rule of contract interpretation that all terms of an insurance policy must be given meaning so as to avoid an interpretation that would render any provision inoperative or superfluous.  See Provident Life & Acc. Ins. Co. v. Knott, 128 S.W.3d 211, 219 (Tex. 2003).

However, the court does not interpret the Debris Removal provision as narrowly as Travelers does.  Section (a) of the Debris Removal provision states generally that Travelers will pay for "your expense" of debris removal.  The court interprets this to mean that the policy will cover expenses to remove demolition material and other trash or construction detritus from the structure for a covered loss up to the policy limits.  The court

---

[57]    Id. pp. 52-53.

[58]    See Doc. 200, Traveler's Reply Mem. in Resp. to Pl.'s Opp. to Traveler's Mot. in Limine to Preclude Evidence of Estimated Claims for Extra Expense, Expedited Expenses, Code Upgrades & Debris Removal Coverage p. 8

finds that debris removal is not synonymous with demolition costs, and any expert who testifies must make that distinction.   See Zurich Am. Ins. Co. v. Keating Bldg. Corp., 513 F.Supp.2d 55, 63-64 (D.N.J. 2007); Harbor Cmtys., LLC v. Landmark Am. Ins. Co., No. 07-14336-CIV, 2008 WL 2986424, at *5 (S.D. Fla. Aug. 4, 2008).

Section (b), which allows "an additional $25,000" when the sum of direct physical damage and debris removal expense exceed the limit of insurance, unambiguously intends to provide an additional amount of up to $25,000 past the Limit of Insurance for debris removal expenses.   Section (b)'s reference to "the sum of direct physical damage and debris removal" as comprising the Limit of Insurance means that debris removal expenses are included in the Limit of Insurance.   And Section (b)'s allowance of *an additional* amount for debris removal expense clearly means that the additional amount of coverage is triggered once the Limit of Insurance has been reached by a combination of direct physical damage and debris removal expenses.

Travelers argues that the Debris Removal provision's use of the words "we will pay for your expense" to mean that the Policy requires that an expense be incurred before the right to reimbursement is triggered and that debris removal therefore cannot be included in replacement costs when determining ACV.   The court agrees, in part.

The Policy's Debris Removal provision clearly considers debris

removal as an item first to be paid within the limits of the policy, along with direct physical damage to the insured property. And the Policy's "Property Loss Conditions" section states that it will "pay the cost of repairing or replacing the lost or damaged property, subject to Paragraph b. below."[59]  Paragraph (b) did not exclude debris removal as an exclusion from the cost of a repair or replacement.[60]  Both parties' experts assumed that debris removal was a usual component of repair and reconstruction, and the court must assume that as well.  Therefore, there is no reason to exclude debris removal from other repair and reconstruction costs and debris removal may be included in the replacement cost component of ACV within the policy limit, if the trier of fact finds that it is reasonably likely to be incurred.

However, the additional debris removal provision's condition precedent, that the policy limits must be exhausted before the provision is triggered, coupled with the provision's use of the phrases, "we will pay for your expense," and "up to an additional $25,000" means that the *additional* debris removal expense is payable up to $25,000 for expenses actually incurred and may not be included in the hypothetical replacement cost component of ACV.

---

[59]    See Doc. 195-1, Ex. A to Pl.'s Resp. to Traveler's Mot. in Limine to Preclude Evid. of Estimated Cls. for Extra Expense, Expedited Expenses, Code Upgrades, Debris Removal, Policy, Sec. E.4.a.(2).

[60]    In fact, paragraph b stated, "The cost to repair, rebuild or replace does not include the increased cost attributable to enforcement of any ordinance or law regulating construction, use or repair of any property, except as provided in the Ordinance or Law Additional Coverage."  Id.

### E.    Motion in Limine Regarding Evidence of Alleged Misrepresentations

This motion addresses Greenspoint's alleged violation of Texas Insurance Code § 541.061(1) for "[m]aking a representation relating to an insurance policy by making an untrue statement of material fact."[61]  Specifically, Greenspoint stated in its Joint Pretrial Order contentions that "Travelers represented to Greenspoint that the Greenspoint estimate was unreasonable by showing Greenspoint a chart . . . demonstrating other projects that it represented were damaged to the same degree as Greenspoint but were repaired at a cost per square foot much lower than what Greenspoint was claiming."[62]  Greenspoint contends that the other projects in the chart were much less affected than Greenspoint's Building, resulting in undervaluations of cost per square foot for the so-called "comparables."[63]  Greenspoint incorporated this allegation and all allegations of violations of the Texas Insurance Code into its list of Texas Deceptive Trade Practices Act violations and its list of bad faith claims.[64]

---

[61]    Doc. 167-1, Ex. A to Jt. Pretrial Order, Greenspoint's Contentions p. 4.  Although Greenspoint did not identify the subsection of Chapter 541 of the Texas Insurance Code associated with this allegation, Greenspoint's language matches with only one provision, § 541.061(1).  Section 541.061(1) reads, "It is an unfair method of competition or an unfair or deceptive act or practice in the business of insurance to misrepresent an insurance policy by: (1) making an untrue statement of material fact."

[62]    Doc. 167-1, Ex. A to Jt. Pretrial Order, Greenspoint's Contentions p. 4.

[63]    Id.

[64]    See id. pp. 6, 7.

While Greenspoint alleged other violations Texas Insurance Code § 541.061, as well as violations of Texas Insurance Code § 541.060 and the DTPA, based on misrepresentations, Greenspoint stated factual support for only one other alleged misrepresentation: "Travelers represented to Greenspoint that it must show actual costs to receive ACV benefit," which, Greenspoint alleged, was a misstatement of law associated with Texas Insurance Code § 541.061(4).[65]   That alleged misrepresentation is not addressed by the motion under consideration here.   As no other misrepresentations have been specified in Greenspoint's Joint Pretrial Order contentions, no other misrepresentation claims will be tried.

Travelers argues that the chart in question does not contain false information and, further, that Greenspoint did not rely on the chart to its detriment and suffered no damages as a result of the alleged misrepresentation.   Travelers also contends that allowing Greenspoint to challenge the accuracy of the chart would result in mini-trials involving collateral evidence that would serve only to waste trial time.   Finally, Travelers argues that any bad faith claim predicated on an alleged misrepresentation is barred by Federal Rule of Civil Procedure 9(b) because no misrepresentation was identified in Greenspoint's complaint or in its contentions in the Joint Pretrial Order.

---

[65]     Id. p. 5; see also id. pp. 4-7.

36

In response, Greenspoint argues that Travelers' motion misrepresented the importance of the chart in deciding what to pay on Greenspoint's claim and that Travelers' reliance on the chart for the decision caused Greenspoint's damages, which flowed from the underpayment of policy benefits.  Greenspoint further contends that it is not required to prove reliance to recover under Chapter 541 of the Texas Insurance Code.  Regarding Federal Rule of Civil Procedure 9(b), Greenspoint contends that Travelers waived the argument by not filing a motion under Federal Rule of Civil Procedure 12, and, even if Travelers had filed a motion to dismiss, Greenspoint would have been given the opportunity to amend.

At the heart of this dispute is the July 23, 2009 Emergency Services Estimate Report prepared by Evan Sussman ("Sussman") of DBI Construction Consultants, Inc., ("DBI").[66]  That report estimated the cost of emergency services to the Building to be $500,955.57.[67]  The estimate projected the length of time required to dry the Building and to perform emergency repairs, as well as the costs of labor, equipment rentals, and materials to complete

---

[66]   See Doc. 193, Pls.' Resp. to Traveler's Mot. in Limine to Preclude Evid. of Alleged Misrepresentations p. 3; Doc. 193-1, Ex. A to Pls.' Resp. to Traveler's Mot. in Limine to Preclude Evid. of Alleged Misrepresentations, Emergency Servs. Estimate Report.

[67]   See Doc. 193-1, Ex. A to Pls.' Resp. to Traveler's Mot. in Limine to Preclude Evid. of Alleged Misrepresentations, Emergency Servs. Estimate Report Tab 1; Doc. 201-2, Ex. 2 to Travelers' Reply to Pls.' Resp. to Traveler's Mot. in Limine to Preclude Evid. of Alleged Misrepresentations, Decl. of Evan Sussman p. 2.

those tasks.[68]   The chart at issue was prepared a month later by Sussman and Di Millo of DBI in anticipation of a meeting with Greenspoint.[69]   The point of the chart was to help "convince Greenspoint at the meeting that its $1,968,882.30 emergency services estimate was excessive."[70]   After the meeting, DBI increased the time and materials estimate to include certain items originally omitted.[71]   DBI's new estimate totaled $547,737.43.[72] Travelers issued a check for emergency services soon thereafter.[73] Sussman testified that the chart was not relied on by Travelers in paying the claim.[74]

The court addresses Traveler's arguments in reverse order.

---

[68]     Doc. 201-2, Ex. 2 to Travelers' Reply to Pls.' Resp. to Traveler's Mot. in Limine to Preclude Evid. of Alleged Misrepresentations, Decl. of Evan Sussman p. 2; see also Doc. 193-1, Ex. A to Pls.' Resp. to Traveler's Mot. in Limine to Preclude Evid. of Alleged Misrepresentations, Emergency Servs. Estimate Report.

[69]     Doc. 201-2, Ex. 2 to Travelers' Reply to Pls.' Resp. to Traveler's Mot. in Limine to Preclude Evid. of Alleged Misrepresentations, Decl. of Evan Sussman p. 3.

[70]     Doc. 201, Travelers' Reply to Pls.' Resp. to Traveler's Mot. in Limine to Preclude Evid. of Alleged Misrepresentations p. 9 (citing Doc. 201-2, Ex. 2 to Travelers' Reply to Pls.' Resp. to Traveler's Mot. in Limine to Preclude Evid. of Alleged Misrepresentations, Decl. of Evan Sussman p. 3).

[71]     See Doc. 201-2, Ex. 2 to Travelers' Reply to Pls.' Resp. to Traveler's Mot. in Limine to Preclude Evid. of Alleged Misrepresentations, Decl. of Evan Sussman p. 4.

[72]     Id.

[73]     See Doc. 193, Pls.' Resp. to Traveler's Mot. in Limine to Preclude Evid. of Alleged Misrepresentations p. 4; Doc. 193-6, Ex. F to Pls.' Resp. to Traveler's Mot. in Limine to Preclude Evid. of Alleged Misrepresentations, Email Dated Oct. 6, 2009.

[74]     Doc. 201-2, Ex. 2 to Traveler's Reply to Pls.' Resp. to Traveler's Mot. in Limine to Preclude Evid. of Alleged Misrepresentations, Decl. of Evan Sussman p. 4.

First, while the court agrees with Travelers that the complaint does not spell out any misrepresentation in conformity with Federal Rule of Civil Procedure 9(b), it appears that Travelers has been aware that Greenspoint's misrepresentation claim has centered on the use of this chart in the adjustment process.  As mentioned above, Greenspoint included this specific misrepresentation claim in its Joint Pretrial Order contentions.  Second, the court is fully capable of managing the submission of evidence to challenge the accuracy of the chart and, thus, will not exclude the chart out of concern that it might provoke time-consuming "mini-trials."

Third, in 2012, the Supreme Court of Texas held that a claim under Texas Insurance Code § 541.061 requires proof that the insurance company made an untrue statement regarding the policy or a statement about the policy that misled the insured.  <u>Tex. Mut. Ins. Co. v. Ruttiger</u>, 381 S.W.3d 430, 446 (Tex. 2012).  That case dealt with a disputed claim under a workers' compensation policy.  <u>See</u> <u>id.</u> at 433.  The insurance company initially refused to pay income benefits or to pay for the worker's hernia surgery.  <u>Id.</u> at 433.  The claim was eventually settled in a workers' compensation benefit review conference, and the insurance company paid the worker temporary income benefits and paid for the surgery.  <u>See</u> <u>id.</u> at 434.

The worker claimed that the insurance company's delay in agreeing to pay benefits or to pay for the surgery "damaged his

39

credit, worsened his hernias, and caused mental anguish, physical impairment, and pain and suffering over and above what he would have suffered if [the insurance company] had timely accepted liability and provided benefits." Id. at 435. The court determined that the Workers' Compensation Act did not preclude a claim under Texas Insurance Code § 541.061 because the statute did not specify that it applies in the context of settling claims and, thus, did not interfere with the dispute resolution process of the workers' compensation system. Id. at 446.

The relevant part of that case for use here is that the court found that, although the worker could bring a claim under Texas Insurance Code § 541.061, he could not succeed on the claim because he failed to "point to any untrue statement made by [the insurance company] regarding the policy or any statement about the policy that misled him." Id. The ourt continued, "The dispute between [the worker] and [the insurance company] was over whether [the worker's] claim was factually within the policy's terms—whether he was injured on the job." Id.

The issue in this case regarding Greenspoint's Texas Insurance Code § 541.061 is the same as that court's last point. The dispute between Greenspoint and Travelers is over whether Greenspoint's claim for emergency services was factually within the policy's terms—whether all of Greenspoint's estimate for emergency services was covered under the policy. The alleged misrepresentation of

40

comparables in the chart is not a statement regarding the policy at all, and Greenspoint points to no untrue statement made by Travelers regarding the policy or any statement about the policy that misled Greenspoint.  Therefore, Greenspoint cannot maintain a misrepresentation claim under Texas Insurance Code § 541.061 for any misrepresentation allegedly made during the claims settlement process regarding the use of the chart.

The court's conclusion eliminates the misrepresentation claim based on the chart.[75]  However, it does not answer fully the question whether Greenspoint may offer the chart, as it asserts is necessary, to prove, inter alia, Traveler's (1) failure "to attempt in good faith to effectuate a prompt, fair and equitable settlement of a claim when the insurer's liability has become reasonably clear;" (2) refusal "to pay a claim without conducting a reasonable investigation of the claim;" and (3) engagement "in an unconscionable act or course of action."[76]  Traveler's motion in limine does not address the chart's admissibility for these other purposes.  Thus, the court will allow the chart to be used as appropriate to prove issues that remain in the case.

---

[75]    The court does not decide whether the misrepresentation claim raised under Texas Insurance Code § 541.061(4) regarding the alleged misstatement of law on the ACV benefit is also insufficient as a matter of law.  The court leaves that claim for trial.

[76]    Doc. 193, Pls.' Resp. to Traveler's Mot. in Limine to Preclude Evid. of Alleged Misrepresentations pp. 9-10.

### IV.   Conclusion

For the reasons discussed above, Travelers' Motion in Limine Regarding the Policy's Inflation Guard (Doc. 162) is **GRANTED**; Travelers' Motion in Limine Related to Repairs to the Fiber Optics Room (Doc. 163) is **GRANTED IN PART AND DENIED IN PART**; Travelers' Motion in Limine to Preclude Evidence of Estimated Claims for Extra Expense, Expedited Expenses, Code Upgrades and Debris Removal (Doc. 164) is **GRANTED IN PART AND DENIED IN PART**; Travelers' Motion in Limine to Preclude Evidence of Alleged Misrepresentations (Doc. 165) is **GRANTED**; Plaintiff's First Motion in Limine (Doc. 166) related to actual cash value is **DENIED**.

**SIGNED** this <u>3rd</u> day of March, 2015.

U.S. MAGISTRATE JUDGE